```
 1                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT OF CALIFORNIA
 2                   WESTERN DIVISION - LOS ANGELES

 3

 4   MARY HENDERSON, et al.,      .  Case No. CV 10-4173-AHM (AJWx)
                                  .
 5        Plaintiffs,             .  Los Angeles, California
                                  .  Monday, November 7, 2011
 6            v.                  .  10:18 A.M. to 10:55 A.M.
                                  .
 7   GRUMA CORPORATION, et al.,   .
                                  .
 8        Defendants.             .
     . . . . . . . . . . . . . . .

 9

10

11                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE ANDREW J. WISTRICH
12                  UNITED STATES MAGISTRATE JUDGE.

13

14   Appearances:               See Page 2

15   Deputy Clerk:              Ysela Benavides

16   Court Reporter:            Recorded; CourtSmart

17   Transcription Service:     JAMS Certified Transcription
                                16000 Ventura Boulevard #1010
18                              Encino, California  91436
                                (661) 609-4528
19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

1  APPEARANCES:

2

3  For the Plaintiffs:        The Weston Firm
                              By:  COURTLAND CREEKMORE, ESQ.
4                             1405 Morena Boulevard, Suite 201
                              San Diego, California  92110
5                             (619) 798-2006

6

7  For the Defendants:        Barnes & Thornburg LLP
                              By:  DAVID C. ALLEN, ESQ.
8                             2049 Century Park East, Suite 3550
                              Los Angeles, California  90067
9                             (310) 284-3860
                              dallen@btlaw.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    LOS ANGELES, CALIFORNIA, MONDAY, NOVEMBER 7, 2011, 10:18 A.M.

2          (Call to Order of the Court.)

3              THE CLERK:  Calling CV 10-4173-AHM (AJWx),

4    Mary Henderson, et al. v. Gruma Corporation.

5              Counsel, please make your appearances.

6              DAVID ALLEN:  Good morning, Your Honor.

7    David Allen on behalf of Gruma Corporation.

8              COURTLAND CREEKMORE:  Good morning, Your Honor.

9    Courtland Creekmore with The Weston Firm on behalf of

10   plaintiff.

11             THE COURT:  All right.  I think you're sitting on

12   the wrong side.

13             All right.  Let's start with the defendants' motion

14   first.  And let me ask plaintiffs' counsel:  Have you

15   completed your production?

16             MR. CREEKMORE:  Yes, Your Honor.

17             THE COURT:  You may go to the lectern.

18             So you've produced all the documents responsive to

19   the requests?

20             MR. CREEKMORE:  Yes, Your Honor, I believe, we

21   have.

22             THE COURT:  Okay.  Including the privilege

23   documents?

24             MR. CREEKMORE:  No, we have not produced privileged

25   documents.  We are waiting the ruling on the motion to compel

1   --

2          THE COURT:  Okay.

3          MR. CREEKMORE:  -- which would seek the waiver of

4   that particular objection.

5          THE COURT:  Okay.  But other than that, your

6   production is complete?

7          MR. CREEKMORE:  To the best of my knowledge, yes,

8   Your Honor.

9          THE COURT:  And when did that occur?

10          MR. CREEKMORE:  I don't have the specific date

11   available.  I can check with my office to ensure that I'm not

12   misrepresenting a particular date.  I don't want to tell you

13   it was on a Monday or a Tuesday of a particular date.

14          THE COURT:  All right.  What about the objections

15   as to overbreadth?  Did you produce documents anyway --

16          MR. CREEKMORE:  Yes.

17          THE COURT:  -- setting that objection aside?

18          MR. CREEKMORE:  Yes, to the best of my knowledge,

19   we have, Your Honor.

20          THE COURT:  All right.  So other than privilege and

21   work product, you've produced all responsive information to

22   the requests?

23          MR. CREEKMORE:  To the extent those documents were

24   available, yes, Your Honor.

25          THE COURT:  Okay.

1          MR. CREEKMORE:  And -- go ahead.

2          THE COURT:  All right.

3          MR. CREEKMORE:  Sorry.

4          THE COURT:  Have you served a privilege log?

5          MR. CREEKMORE:  I do not believe we have served a

6   privilege log, sir.

7          THE COURT:  Why not?

8          MR. CREEKMORE:  I don't have an answer for you.

9          THE COURT:  Well, isn't it required?

10          MR. CREEKMORE:  It is required, Your Honor.

11          THE COURT:  All right.  You're familiar with the

12   Burlington Northern case?

13          MR. CREEKMORE:  I know somewhat about that case,

14   sir.

15          THE COURT:  And what does it say?

16          MR. CREEKMORE:  I couldn't give you specifics on

17   what the --

18          THE COURT:  All right.

19          MR. CREEKMORE:  -- Burlington Northern case says.

20   But I am aware of our obligation to produce a privilege log,

21   and, again, I don't know specifically why that has not been

22   produced.

23          THE COURT:  But it hasn't been?

24          MR. CREEKMORE:  I do not believe that it has, sir.

25          THE COURT:  Okay.  Well, under that case -- how

1    many months have passed now since the period for serving a

2    response elapsed?

3            MR. CREEKMORE:  The --

4            THE COURT:  It was about three months before you

5    served the responses.

6            MR. CREEKMORE:  That's correct, sir.

7            THE COURT:   And then -- what? -- it's another

8    almost two months since then; right?  So almost five months.

9            MR. CREEKMORE:  Yes, Your Honor.

10           THE COURT:  Okay.  Well, in the Burlington Northern

11   case, the Ninth Circuit said that a five-month delay is

12   plenty long enough to justify a waiver of any privilege

13   claims simply for failing to serve a privilege log.  So what

14   am I to do in this situation?  Do I have any choice at all

15   but to find that all the privileges have been waived?

16           MR. CREEKMORE:  Your Honor, I think that adopting a

17   -- for lack of a better word -- sort of all-or-nothing

18   standard when none of the factors relating to Gruma's alleged

19   prejudice have been shown -- there's not a single --

20           THE COURT:  Well, there are two issues here.  I

21   mean, one is did you waive the privilege by not serving

22   objections until three months had passed after they were due?

23           MR. CREEKMORE:  As a technical matter, yes, sir, we

24   did.

25           THE COURT:  Okay.  And, I mean, the law is pretty

1   clear that, if you do that, you generally have waived your

2   privileges.  Some courts say you should consider some

3   factors.  I didn't find your analysis of the factors all that

4   persuasive, I mean, for example, to say this wasn't a very

5   long time.  I think the cases that say not much time has

6   passed usually are dealing with someone made a clerical

7   error, they miscalculated the date, they served their

8   responses a few days late --

9           MR. CREEKMORE:  Yes, sir.

10           THE COURT:  -- not like this.  But that's one basis

11   for waiver, potentially.  But the other is simply not serving

12   a privilege log.  Now, I can't understand why you wouldn't

13   serve the log when you found out about this problem and

14   served the responses.  And if you couldn't do it that day,

15   why didn't you do it in a week or two?  I don't understand

16   that.  Is there any explanation?

17           MR. CREEKMORE:  At this time, Your Honor, I do not

18   have an explanation for that.

19           THE COURT:  All right.  Anything else you want to

20   tell me on this?

21           MR. CREEKMORE:  The declaration of Mr. Fitzgerald,

22   I think, sets forth the underlying facts for why this

23   administrative error occurred with regard to responding to

24   Gruma.  Furthermore, I think that it's pretty clear that --

25   despite what is in Mr. -- I believe -- Kirwan's declaration

1    -- that there absolutely was not compliance with Local

2    Rule 37-1 with regard to putting plaintiffs on notice of

3    their deficiencies in their -- with regard to any

4    deficiencies in their responses.  There are several cases

5    that we've cited that make clear that that is an absolute

6    condition precedent before coming to the court to ask for

7    relief and --

8         THE COURT:  See, here's the problem I have with

9    that -- okay? -- you served the responses three months late

10   so, you know, there is going to be a waiver of most of the

11   objections, if not all of the objections, under the very

12   clear law.  I'm just wondering -- you know, you say, "Well,

13   they didn't exactly go through each request."  What's to talk

14   about?  I mean, that's an egregious error.

15        All right.  Defendant wish to be heard on this?

16        I just want to be sure you don't have anything else

17   to say, especially on this <u>Burlington Northern</u> waiver issue

18   for failure to serve a privilege log.  You know, you have

19   some discretion.  You want to tell me about, you know, why I

20   shouldn't find a waiver?

21        MR. CREEKMORE:  Well, Your Honor, I -- number one,

22   not having the -- not having knowledge, myself personally, of

23   the production of a privilege log, I can't stand here and

24   represent to the Court that one's been produced, and I think

25   the more prudent course of action is to tell you that, to my

 1   understanding, one has not been produced.

 2          THE COURT:  Okay.

 3          MR. CREEKMORE:  If it turns out that one has been

 4   produced and I'm personally unaware of it, I would let you

 5   know.  But I can't disagree with the gravity of the situation

 6   should it turn out to be the case that one hasn't been

 7   produced at this late date.

 8          THE COURT:  All right.  Well, thank you.

 9          MR. CREEKMORE:  You're welcome.

10          MR. ALLEN:  Your Honor, good morning.  I wish to

11   add only one thing.  To my knowledge, Your Honor, no

12   documents have been produced by plaintiffs in response to the

13   request for production of documents.  I sent an e-mail this

14   morning before I came in just to make sure, and the report

15   back was we have received no documents.  Now, if they're in

16   the mail or in the process of being delivered, obviously, I

17   don't know that, but as of Friday -- and then I confirmed

18   again this morning -- based on -- we've received no documents

19   responsive to our requests.  That's the only thing I have to

20   add.

21          THE COURT:  Well?

22          MR. CREEKMORE:  As I said before, Your Honor, to

23   the best of my knowledge, documents have been produced.  I

24   personally did not --

25          THE COURT:  Here -- I have a real concern here.

1          MR. CREEKMORE:  I understand.

2          THE COURT:  Okay?  I don't know what your role is

3   in this case, but, frankly, you don't seem fully informed

4   given the seriousness of the issue.  Who could answer these

5   questions?

6          MR. CREEKMORE:  I believe that Mr. Fitzgerald might

7   be able to answer these questions.  He is currently in a

8   hearing in another court this morning.  I was asked to cover

9   this particular hearing, Your Honor.

10          THE COURT:  Are you with The Weston Firm?

11          MR. CREEKMORE:  Yes, sir.  I just started with them

12   in September.

13          THE COURT:  Okay.

14          MR. CREEKMORE:  And I, unfortunately -- I really

15   apologize -- I was not personally involved in the discovery

16   negotiations and discussions with Gruma's counsel.  My only

17   role thus far has been to fill in on a couple of 30(b)(6)

18   depositions.  I was under the impression that whatever

19   responsive documents we had in our possession, custody, and

20   control had been produced, I don't believe a privilege log

21   has been produced, and I apologize for not having sufficient

22   information for the Court.

23          THE COURT:  All right.  Well, I'm a little bit

24   disappointed in you for not being sure that you were fully

25   informed about the facts, but I'm very disappointed in your

1  colleagues, and I think this is really terrible for them not

2  to prepare you adequately with the facts and to send you here

3  on something that they describe as the "death knell" to this

4  action.  That's the way it's described in your papers.  I

5  just think that's appalling.

6          So this matter is -- this motion is submitted.

7          Let's turn to the other motion, and that is

8  plaintiffs' motion to compel.

9          So let me ask defense counsel a couple of questions

10  here.  I don't understand how there could be not a single

11  e-mail, as they tell me.  Is their representation true?

12          MR. ALLEN:  Your Honor, I believe it is.  We've --

13  here's the issue as -- perhaps some background would help you

14  understand because it does provide context to the two

15  depositions that were taken of the knowledgeable people about

16  these product labels.

17          And that is, first, with respect to the spicy bean

18  dip, which is a product that has been discontinued because of

19  the lack of sales -- it seems like there's a lot of money at

20  issue and -- where it says it's $5 million -- I forget the

21  exact number -- but in the context of Gruma Corporation,

22  unfortunately, that's a small number.  And so this product,

23  because it was declining, because it was made by a third-

24  party contract manufacturing -- pursuant to a manufacturing

25  contract, pretty quickly they came to the determination that

1    it was not going to be a successful product.  So we have

2    searched; there are no e-mails that deal with the content of

3    the label, decisions about what to put on the label.  Those

4    things were done by contract -- by the contract manufacturer.

5    They were required to prepare the label since they were

6    controlling, in essence, the ingredients.  And so we have

7    searched; we don't have an e-mail on it.

8           I agree with you, Your Honor -- which is why we

9    went back and looked again -- in this day and age why

10   wouldn't there be an e-mail?  I believe the answer goes to

11   the fact that these are not large products within the

12   Gruma Corporation and the fact that all of the marketing and

13   the manufacturing occurs by third parties pursuant to a

14   contract is probably the explanation.

15          THE COURT:  Well, I hope you've been very careful

16   because, if it comes out at the 11th hour that there are a

17   lot of e-mails, you and your client could be in serious

18   trouble.

19          MR. ALLEN:  I understand.  We are actually

20   searching again, Your Honor, just to make sure, but we have

21   done the search.

22          THE COURT:  Okay.  Tell me about the advertising

23   materials.

24          MR. ALLEN:  Advertising in general or the materials

25   that were attached to the plaintiffs' joint statement?

1          THE COURT:  Advertising in general.

2          MR. ALLEN:  Advertising in general.

3          THE COURT:  Why isn't that relevant?

4          MR. ALLEN:  I would say two things, Your Honor.  I

5    think what we're talking about really is a collision or

6    intersection between Proposition 64 and Rule 26, where

7    discovery at a minimum has to be reasonably calculated to

8    lead to admissible evidence.  Here, the statutes that are at

9    issue, the claims that are at issue are derived from statutes

10   that require actual reliance.  That is, the reliance on the

11   misrepresentation -- be it in an advertisement, in a label --

12   whatever source -- has to have actually been the motivating

13   factor that caused the plaintiff to purchase the product.  I

14   think the case law discusses it in the context of "but for

15   the advertisement, they wouldn't have purchased the product."

16   Here, we have undisputed testimony from both class

17   representatives that they did not view any advertising for

18   either product.

19          So the difference is based on the discussions of

20   Prop 64, which says "Look, you cannot represent" -- you know,

21   Prop 64 did two things, as we all know:  one, it changed the

22   standing requirements by adding 17204 to say that you had to

23   have injury in fact, which has been defined in the case law

24   as being loss of money due to the misrepresentation.  The

25   other thing Prop 64 did, which is not as much talked about,

1  is it added to Section 203, which permitted a representative

2  action.   In that section it said a class representative has

3  to qualify for the 17204 standing requirements.

4         So, here, what we have is, in order for a trial to

5  go forward on these two class-representative claims, if they

6  wish to represent a class -- that is, allege to have been

7  deceived by advertisements -- they, too, must be able to show

8  that they actually relied on those advertisements.  They've

9  testified repeatedly that they have not seen them.   Thus I

10  don't think it qualifies with respect to Rule 26 that this

11  discovery would lead to admissible evidence.

12         And I would point out, unlike the Florida case that

13  is cited by the plaintiffs -- the Fitzpatrick case -- that

14  statute at issue there -- the Florida Unfair Trade Practices

15  Act -- is exactly like the 17200 was prior to Prop 64.  All

16  you need prove is that a consumer was likely to be deceived.

17  And in fact, in that case, the trial court cites the

18  Eleventh Circuit as saying actual reliance is not necessary

19  to be proved under the Florida statute.  Therefore, they

20  allowed that discovery to come in because it was relevant, it

21  was reasonably calculated to lead to admissible evidence to

22  show that some consumer could likely be deceived.

23         THE COURT:  Well, what if their theory is that your

24  client was misrepresenting the content of one of these

25  products and they misrepresented it in a variety of ways and

1    some class members were exposed to the same identical

2    statement on a radio ad and others looked at the label and

3    others saw an Internet ad, but they all were told exactly the

4    same thing?  Why can't they proceed on that theory?

5              MR. ALLEN:  Well, first, they have not alleged that

6    theory, but nonetheless, my view would be -- is that, in

7    order to comply with Proposition 64, they could not show that

8    they were actually deceived by that representation.  In other

9    words --

10             THE COURT:  Even if they -- even if, as the

11   plaintiffs say, they read it on the label?

12             MR. ALLEN:  I think what --

13             THE COURT:  I mean, let's assume for a moment --

14             MR. ALLEN:  Sure.

15             THE COURT:  -- that the statement was deceptive --

16   okay? -- just for the sake of argument.

17             MR. ALLEN:  Understood.

18             THE COURT:  All right?

19             MR. ALLEN:  Understood.

20             THE COURT:  Can't you have a class where people

21   were exposed to that identical statement in different fora?

22   I mean, do they have to have a plaintiff who saw a TV ad --

23   class representative -- as well as one who listened to a

24   radio ad, as well as one who got an e-mail about it, even

25   though it's all the identical statement?

1      MR. ALLEN:  I would say, if the hypothetical you're

2  posing is that in each of those venues -- each of those media

3  that they're -- or each of those medium -- that there was the

4  exact statement and nothing else -- no context to put around

5  the statement, nothing to balance it -- then you're probably

6  correct.  But here I don't think we have that.  The case law

7  says with respect to labeling you have to look at the

8  statement in the context of the entire label.  The cases with

9  respect to advertising are the very same way.  You have to

10 look at the statement in the context of the entire

11 advertisement.  So standing alone, if there was nothing else

12 surrounding it, then I think you could say that discovery of

13 those statements are reasonably likely to lead to admissible

14 evidence because there's no difference between what the --

15     THE COURT:  Well, don't we have to look at the ads

16 to see what the context is?  What if, you know, the ad just

17 says, you know, "Get product X from Mission.  No trans fat"?

18 That's all the ad says.

19     MR. ALLEN:  If all the ad said was that, then I

20 could see a reasonable argument that that would be

21 discoverable.  My concern here, Your Honor, is we've sort of

22 gone in several different directions in this case.  We no

23 longer have any issues about trans fat.  They have been

24 dismissed.  So now we're talking about claims about whether

25 the word "flavored" is sufficient to distinguish this product

1  from fresh guacamole.  And on the spicy bean dip, it's --

2  again, it's even less of a connection.  As best I can tell

3  you -- and it seems, to me, if health claims were being made,

4  as they were in the Florida case that they cite and some of

5  the other cases that have been in the briefing, then perhaps

6  you're correct that because that's -- but we're not focused

7  on health claims anymore.

8           And so, to me, I think, if -- in this particular

9  instance, where you have this intersection, where we have

10  testimony they didn't rely on it, and we also have testimony

11  they didn't read the label.  So we're going far afield now to

12  find statements in other media that they never saw, that may

13  or may not be the same as how they read the label because

14  they didn't read the label.  And that's where our concern was

15  we were going further afield than where we needed to be in

16  light of Rule 26.

17           THE COURT:  Where's a reasonable place to draw the

18  line here?  Would it be with the content of the ads, for

19  example, without -- I mean, their requests, I thought, were

20  quite broad, maybe not fully thought through, but what about

21  just the content of the ads?

22           MR. ALLEN:  If Your Honor is of a mind to allow

23  discovery in some area, then I do think it makes sense to

24  draw the line with respect to the content, and what I would

25  state is that it would have to go to the statements or the

1    alleged misrepresentations that remain at issue.

2              THE COURT:  Uh-huh.

3              MR. ALLEN:  And those two statements are:  one,

4    guacamole-"flavored" dip with respect to the first product;

5    and two, "all natural" with respect to the spicy bean dip.

6              THE COURT:  Okay.  With respect to requests 17 and

7    18, they're looking for documents about what percent of the

8    products are manufactured in California.  That information

9    seems to be relevant, potentially, to deciding what law

10   should be applied to the class claims.  Is there a better way

11   to get them that information?

12             MR. ALLEN:  We believe so, Your Honor, and I

13   believe we've given them the names of our contract

14   manufacturers who maintain that information.  The sales data

15   that we did give them was by state, but it doesn't go by

16   unit, but we don't track it by unit.

17             THE COURT:  Uh-huh.

18             MR. ALLEN:  So we've given them the state-by-state

19   information we had and identified where they could go to get

20   the actual production data from the contract manufacturer.

21             THE COURT:  So you're saying your client does not

22   know, for example, whether all of one of these products is

23   made in Mexico or some made in California and some in Mexico,

24   they're just totally clueless about that?

25             MR. ALLEN:  I wouldn't say they're "clueless."  I

1    might get in trouble for saying they're "clueless."  But what

2    we tried -- they asked for records, as opposed to, say, a

3    knowledgeable person.  What we gave them was records we've

4    kept in the ordinary course of business which track dollars.

5              THE COURT:  Uh-huh.

6              MR. ALLEN:  And we've given them to them by state.

7              THE COURT:  Uh-huh.

8              MR. ALLEN:  And because they were searching for

9    actual production, we gave them the names of the companies

10   where they could get it if they desired to have per unit as

11   to where it was mostly manufactured.  I'm trying to think of

12   a way -- I recognize the relevance --

13             THE COURT:  I mean, I take it, if they noticed a

14   30(b)(6) deposition, you'd be happy to provide somebody to

15   answer that question.

16             MR. ALLEN:  Yes.

17             THE COURT:  Or you do it in response to an

18   interrogatory.

19             MR. ALLEN:  Correct.

20             THE COURT:  Okay.  Because you could certainly find

21   out --

22             MR. ALLEN:  We could --

23             THE COURT:  -- from your suppliers.

24             MR. ALLEN:  Yes.  Yes, Your Honor.

25             THE COURT:  Yeah.

1          MR. ALLEN:  This was a question of simply "Do you

2    keep records in that regard?"

3          THE COURT:  Uh-huh.  All right.  Let me hear form

4    plaintiffs' counsel.

5          MR. ALLEN:  Thank you, Your Honor.

6          THE COURT:  Oh, one more thing.  Did you serve a

7    privilege log?

8          MR. ALLEN:  We did not because we did not withhold

9    any documents under a claim of privilege.

10          THE COURT:  Okay.

11          Any response?

12          MR. CREEKMORE:  I think that you brought up a

13    couple of important points, Your Honor, and the most

14    overarching one that I would just like to pile on has to do

15    with the limitation of discovery not being constrained by the

16    pleadings, rather the discovery of the information that you

17    spoke about, the ad content particularly I think --

18          THE COURT:  Well, I mean, we are supposed to be

19    governed by the pleadings -- aren't we? -- in discovery.  I

20    mean, isn't that what frames the scope of relevance?

21          MR. CREEKMORE:  Absolutely, Your Honor.

22          THE COURT:  Okay.

23          MR. CREEKMORE:  I was only trying to clarify that

24    the issues that Gruma's counsel spoke of with regard to

25    reliance, I don't think that the presentation was entirely

1    clear in that the label itself on a particular product is a

2    form of advertising, and you touched upon the notion that

3    oftentimes the claims that are made on a label sitting on the

4    shelf are exactly the same as those claims that are found in

5    another type of media.  And so we think that to the extent

6    that those messages were reasonably coextensive applying to

7    either the named class representative or a member of the

8    general public that at a very minimum we should be able to

9    analyze those advertisements and have someone make the call

10   as to whether or not they serve to show a broader practice of

11   what we allege to be deceptive activity on behalf of Gruma.

12            THE COURT:  Well, where in your complaint is the

13   theory that I described articulated?  Got the corrected first

14   amended complaint in front of me.  Where should I look to see

15   the theory described that broadly, rather than just limited

16   to the labels?

17            MR. CREEKMORE:  I don't have the first amended

18   complaint in front of me, Your Honor.

19            THE COURT:  I --

20            MR. CREEKMORE:  I couldn't remember it --

21            THE COURT:  Well, I take it you're familiar with

22   it; right?  You've been working on the case.

23            MR. CREEKMORE:  Yes, sir.

24            THE COURT:  So you can't help me out here?

25            MR. CREEKMORE:  Well, I mean, Judge, I'm kind of in

1    an unfair position.  I don't have the complaint in my hand,

2    and I can't remember --

3                THE COURT:  Well, here.  I'll give it to you.

4                MR. CREEKMORE:  Thank you very much.  May I

5    approach?

6                THE COURT:  My clerk will give it to you.

7                MR. CREEKMORE:  Thank you.

8                (Pause.)

9                MR. CREEKMORE:  Well, Your Honor, with --

10   specifically addressing the claim of the guacamole-flavored

11   dip labeled as "guacamole," at paragraph 83 plaintiffs'

12   allege "Plaintiffs further read and relied on Gruma's

13   misleading 'guacamole' and 'made in the authentic tradition'"

14   -- that second portion has since been stricken -- or

15   overruled -- "believing that they were purchasing real

16   guacamole complete with avocados."  So we make the statement

17   -- the general claim -- now, that could, again, come in the

18   form of something made on the label --

19               THE COURT:  Right.  But we -- you know, we're in a

20   peculiar position in this case -- aren't we? -- because your

21   clients' depositions have been taken and now we know what

22   they read and what they didn't read and what they relied on

23   and what they didn't rely on.

24               MR. CREEKMORE:  And it could very well be the case,

25   Your Honor, that members of the proposed class relied on the

1    very same types of statements that were made in advertising,

2    regardless of whether that advertising was a label form of

3    advertising or advertising in a magazine ad or advertising on

4    a coupon or advertising on television.  It could have had the

5    exact same visual impression, the exact same words laid out

6    in the exact same pattern or manner.  I don't see how it

7    makes a difference whether --

8            THE COURT:  Well, let's say they had an ad that

9    just consisted of a picture of the label.  Your clients --

10   the class representatives didn't rely on that.

11           MR. CREEKMORE:  They relied on something almost

12   exactly the same as that.  I mean, it doesn't seem to -- I

13   don't understand how it's different if it's a jar sitting on

14   a shelf here or there's a picture of that jar in a "Parade"

15   magazine.  It seems to be the same.

16           THE COURT:  Uh-huh.  Okay.  So paragraph 83 is what

17   I should look at, then.  Anything else?

18           MR. CREEKMORE:  Well, with regard -- that was with

19   regard specifically to the claim about the guacamole.  And --

20           THE COURT:  What I'm looking for here, again, just

21   so we're clear, is I'm looking for something that alleges the

22   use of this in places other than the label.  That's what I'm

23   looking for.  Did your pleading go beyond that?

24           MR. CREEKMORE:  I don't want to waste the Court's

25   time and stand here and read the entire complaint.  I can --

 1                 THE COURT:  If you don't know --

 2                 MR. CREEKMORE:  I don't know.

 3                 THE COURT:  -- that's perfectly fine as an answer.

 4   Okay?

 5                 MR. CREEKMORE:  I don't know with specificity, and,

 6   again, I don't want to misrepresent.

 7                 THE COURT:  I just was looking for a little help

 8   here.

 9                 MR. CREEKMORE:  Sure.

10                 THE COURT:  All right.  Why don't you return the

11   complaint to my clerk so I can have it.

12                 Thank you.

13                 Now, I'm somewhat puzzled by some of these

14   requests.  I just don't really understand their pertinence.

15   Let's just take interrogatory 4, for example.  You're asking

16   about advertising expense, and I'm just wondering, you know,

17   what difference does it make whether they spent 10,000 or

18   100,000?  What is that going to get you?

19                 MR. CREEKMORE:  I think, Judge, the focus of that

20   particular interrogatory was designed to help us find out the

21   extent to which the advertising campaign with regard to the

22   two products, its breadth and its depth.  Without having the

23   benefit of any particular form of advertising produced in

24   discovery, we were attempting, through whatever channel we

25   could, to come up with an understanding for how broad and how

1  deep the advertising campaign for these two products went.  I

2  think we could get some information --

3          THE COURT:  All right.  So what if they said

4  $100,000.  What would you do with that then?

5          MR. CREEKMORE:  Well, we might try to find out who

6  that money was spent on or how that money was spent.  I mean,

7  knowing and having some research done on what it costs to put

8  magazine impressions, Internet impressions, and so forth, out

9  there would give us some idea of how broad and how deep the

10  campaign ran and how many eyeballs --

11          THE COURT:  All right.  Suppose they said $5,000.

12  What would you do with that?

13          MR. CREEKMORE:  The same thing, Your Honor.

14          THE COURT:  So why does it matter what their answer

15  is?

16          MR. CREEKMORE:  Well, at some point --

17          THE COURT:  You'd do the same thing in either case.

18          MR. CREEKMORE:  Well, at some point, if you're

19  making the argument about things like numerosity and

20  application for a nationwide class and those sorts of things,

21  you want to have something to back that up.

22          THE COURT:  All right.  What about the definition

23  of the term "marketing" that you use frequently?  And that

24  includes things like shipping.  I mean, when you ask for

25  employees who were involved in any of the marketing,

1  advertising, et cetera, you mean to ask them to list, you

2  know, people in the warehouse working on shipping the

3  products?  I just wonder what you're going to do with --

4          MR. CREEKMORE:  No.  That's a fair --

5          THE COURT:  -- a lot of this information.

6          MR. CREEKMORE:  That's a fair point, Your Honor.

7  And that request could definitely be narrowed, and we could

8  probably come to a very quick agreement, I think, on the

9  folks that we were inquiring about, the people who were

10  responsible for the actual decisions relating to marketing

11  the product, putting it out there for public consumption.

12  And I agree with you that, no, we wouldn't be asking for the

13  names of a truck driver or a warehouseman or something like

14  that.  That is excessive.

15          THE COURT:  All right.  What about distributors?

16  You ask them to identify their distributors.  I guess they've

17  done that anyway.

18          MR. CREEKMORE:  To some degree, yes, Your Honor.

19          THE COURT:  Yeah.  So you don't need that -- you

20  don't need documents about that anymore, do you?

21          MR. CREEKMORE:  No, sir, I don't believe we do.

22          THE COURT:  Or the vendors or suppliers?

23          MR. CREEKMORE:  I think that we have established

24  facts regarding the vendors and suppliers.

25          THE COURT:  I'm wondering, you know, if you're

1   satisfied that you have a lot of this information, why you

2   didn't withdraw some of these from the motion, why I was

3   forced to look at every single one of them?  I mean, for

4   example, document request No. 4, "Documents sufficient to

5   show the identity of any suppliers, vendors, or distributors

6   involved in the marketing, manufacturing, or developing of

7   any of the products during the class period."  I just asked

8   you about that.  You said you think you have enough --

9            MR. CREEKMORE:  Actually, Your Honor --

10           THE COURT:  -- you don't need any more on that.

11           MR. CREEKMORE:  Well, when we're talking about

12  suppliers or vendors or distributors that move the product

13  from one place to another, that's separate and apart from any

14  role that any one of them might have had with regard to

15  marketing the product.

16           THE COURT:  Well, now I don't know how I would

17  respond to this now that you've said that.  I wouldn't know

18  what to do if I were the defendants in response to this

19  request.  I wouldn't really know what I can exclude, what I

20  can't exclude.

21           Can we agree that discovery should be limited to

22  these two products that remain at issue in the case?

23           MR. CREEKMORE:  Yes, Your Honor.

24           THE COURT:  And what about as to advertising?

25  Could we agree that discovery should be limited to these two

 1  specific statements remaining?  If we're going to consider

 2  the possibility of going beyond labels to other

 3  advertisements, could we restrict it to those two specific

 4  statements in other media?

 5        MR. CREEKMORE:  I think that would be fair,

 6  Your Honor.

 7        THE COURT:  Okay.  Anything else you want to tell

 8  me on this right now?

 9        MR. CREEKMORE:  No, sir.

10        THE COURT:  All right.  Thank you.

11        MR. CREEKMORE:  Thank you.

12        THE COURT:  Okay.  Anything further for defendants?

13        MR. ALLEN:  No, Your Honor.

14        THE COURT:  All right.  This matter is also

15  submitted.  Thank you.

16        MR. ALLEN:  Thank you, Your Honor.

17     (Proceedings adjourned at 10:55 A.M.)

18  ///

19  ///

20

21

22

23

24

25

1

2

3

4                                CERTIFICATE

5            I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa                November 16, 2011
     Julie Messa, CET**D-403        Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25